Memorandum of Decision
CT Page 4918
On September 10, 1997, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Arthur S. and Sylvia S. to their minor daughters, Alison S. and Dasia S. A consolidated trial of these petitions took place on April 7 and 8, 1999. For the reasons stated below, the court grants the termination petitions.
FACTS
The court finds the following facts and credits the following evidence.
A. The Parents
DCF became involved with Sylvia S., the mother in this case, in 1988, when she gave birth to her second child. Over the next seven years, DCF received reports that the mother was using various forms of cocaine, that the mother missed medical appointments for the children, that the mother was homeless, and that the children were neglected.
In 1995, the mother became pregnant through a nonmarital relationship with the father, Arthur S., who was and remains married to another woman. The mother attended only two prenatal appointments and at the second one tested positive for cocaine. On August 2, 1995, the mother gave birth to Alison at thirty-two weeks gestation. Both the mother and Alison tested positive for cocaine at the time. Alison weighed only two pounds at birth.
On August 22, 1995, DCF obtained an order of temporary custody of Alison, who remained in the hospital until September 2, 1995. With the agreement of the parents, who realized that they were not then capable of rearing Alison, DCF placed Alison with her maternal grandmother. On February 1, 1996, the parents pleaded nolo contendere to a neglect petition, the court committed Alison to DCF custody, and the court entered expectations.
DCF offered unlimited visitation with Alison and supplied the parents bus passes, but the parents did not visit often. A DCF social worker regularly urged the mother to obtain drug treatment, and offered transportation for that as well, but the CT Page 4919 mother avoided the matter. The father tested positive for cocaine on May 6, 1996. Visits by DCF to the parents' home revealed it to be in deplorable condition and the parents to be drinking.
In November, 1996, DCF removed Alison from the grandmother's home because of the grandmother's own drug use and medical neglect. Alison then went to two different foster homes for several months each.
The mother became pregnant again through the father in late 1996. The mother attended only one prenatal appointment and used alcohol daily during her pregnancy. On February 15, 1997, Dasia (called Daisy) was born at twenty-three weeks gestation. The baby weighed only one pound and had significant respiratory problems. The mother tested positive for cocaine at the time.
The parents visited Daisy in the hospital five times during her first twenty-one days. The parents visited sporadically after that until June 10, 1997, when DCF obtained an order of temporary custody. At that time, DCF placed Daisy in the foster home of Vicki and Norman G.[2] Two weeks later, DCF placed Alison in the G. home as a result of the disruption of Alison's prior two foster homes. On July 24, 1997, the court adjudicated Daisy to be neglected and committed her to DCF custody.[3]
The DCF case worker met with the mother in April, 1997 and persuaded her to enter a detoxification program, which lasted thirty days. But the mother failed to follow through with aftercare expectations. DCF referred the mother to parenting classes on several occasions, but the mother did not enroll. The mother visited her children in foster care only once between March and September, 1997. She became transient. As stated, on September 10, 1997, DCF filed for termination.
Since that time, the mother visited Alison and Daisy only on several occasions between April and June, 1998. She has not provided them with gifts or cards on birthdays, holidays, or any other occasions. In 1998, the mother entered several detoxification programs but again failed to participate in recommended aftercare treatment. The mother has contacted DCF sporadically over the years. She failed to appear for trial. DCF's latest information is that the mother, who is now 38, is living with her mother in an elderly housing complex where children are not allowed. CT Page 4920
Between March and early December, 1997, the father did not contact DCF and DCF could not locate him. The father appeared at a court default hearing in December, 1997. At that time, DCF learned that the father had been living in a homeless shelter since September, 1997. As a result of the court hearing, the father received an additional opportunity to regain custody of his two children. The father then visited the children consistently until about a month before trial, at which point he missed three of the next four visits. Also during 1998, the father completed a parenting class and a drug treatment program, and obtained a full time job. On the other hand, the father did not maintain a support network with the drug treatment center and tested positive for cocaine in October, 1998. The father failed to attend a second drug evaluation. He did attend a third evaluation and tested negative. He also failed to attend birth control counseling as required by court expectations. See note 4infra.
In mid-March of this year, the father left the shelter and moved back with his wife, Leatha M.-S, after a five year separation. Leatha has a three bedroom apartment with seven children. DCF has been involved with this family since November, 1997 and apparently now monitors the children under a disposition of protective supervision. Two of the children are the father's, four of them stem from Leatha's relationships with two other men, and the seventh child is Leatha's niece.
The father, now 43, has not been working, although he claims to be in job training. He does not give the children there a great deal of attention. Leatha has a history of drug and alcohol abuse. For that reason, and because of behavioral problems with one child and missed medical appointments for another, DCF has moved to modify the disposition in favor of commitment. The father nonetheless proposes that Alison and Daisy be returned to him so that he can rear them in this home.[4]
The mother, father, and the two children attended a psychological evaluation by Dr. David Mantell, a clinical psychologist, in May, 1998; all but the mother attended subsequent sessions in February, 1999. Although the parents were appropriate and affectionate with the children, the children did not smile, laugh, or engage in play with them. A mental evaluation of the mother revealed her to be functioning at a low level intellectually, immature, and possibly suffering from a mental disorder, in addition to a history of substance abuse. The CT Page 4921 father also has a low intellectual capacity, a simplistic view of the world, and a history of substance abuse and criminal arrests.
B. The Children
Soon after Daisy arrived at the foster home of Vicki and Norman G. as a tiny baby, she developed difficulty breathing, became lethargic, and would exhibit projectile vomiting. In October, 1997, Daisy was diagnosed as having hydrocephalus and doctors placed a shunt in her brain to draw away fluid. Since that time, Daisy has become very active and now, at age two, she sees and speaks well. Daisy receives assistance from Birth to Three for motor skills and upper body stiffness. The foster parents still monitor Daisy closely for problems with her shunt.
When Alison arrived a few weeks after Daisy, Alison reacted by refusing to eat or sleep, pulling her hair out, banging her head, crying incessantly, and biting. Through the hard work and devotion of the foster parents, those behaviors have now subsided. Alison, now almost four years old, has also begun to overcome deficits in the areas of speech, attention span, and frustration tolerance. This result, again, came about because the foster parents spent more than the usual amount of time with Alison reading, singing, and engaging her in play. Alison also received assistance from Birth to Three and now continues in a preschool program.
Alison and Daisy are black and the foster parents are white. Despite this difference, there are strong emotional bonds between the children and the foster parents. Alison and Daisy call the foster parents "Mommy" and "Daddy." Alison waits until both parents are home from work or other evening activities before she, will go to sleep at night. Alison and Daisy interact well with the five other children in the foster parents' home.
The foster parents would like to adopt Alison and Daisy if they became available. They are aware of the difficulties of multiracial families, but they plan to address their children's questions and concerns. The foster parents have been receptive to DCF's suggestions about exposing the children to an integrated community.
The children did not interact enthusiastically with their natural parents during visitation sessions. While in the current foster home, Alison would originally scream when the time came CT Page 4922 for a visit. Now she gets very quiet both before and after visits. She does not talk about them.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. Such a finding was made for Alison by Judge Christine Keller on January 20, 1998 in extending Alison's commitment. With regard to Daisy, the court finds by clear and convincing evidence that DCF has made reasonable efforts to reunite the parents through visitation, referral to drug treatment and parenting classes, and provision of transportation. The parents have been unwilling and unable to benefit from these reunification efforts.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112(c)(3). General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the court waives the one year requirement based on the standards set forth in § 17a-112(d). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). Because DCF amended the petition by way of a motion filed December 16, 1998, that date becomes the adjudicatory date.
DCF in this case has alleged, for both children, the grounds of abandonment against the mother and failure to rehabilitate against both parents. The court finds that DCF has proven its allegations by clear and convincing evidence. CT Page 4923
 1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' or the welfare of the child." In reMigdalia M., 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
In this case, the mother's record of visitation with her children has been poor. Even when DCF offered free transportation to her own mother's residence to see Alison, the mother did not visit often. The mother visited her children only a handful of times when they were in foster care. The mother has not provided the children with gifts or cards on birthdays, holidays, or any other occasions. She has not maintained contact with DCF so that she could learn of her children's welfare. Based on this evidence, the court finds that DCF has proven by clear and convincing evidence that, for a period of more than one year, the mother has abandoned the two children in this case.
 2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(C). No dispute exists that the court has separately adjudicated Alison and Daisy to be neglected, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether CT Page 4924 the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(C). The statute requires the court to analyze the parents rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'"In re Luis C., 210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted). Because of the requirement that the court predict what will happen within a "reasonable time" after the adjudicatory date, it is sensible to conclude that the court can consider not only the parents' conduct before the adjudicatory date, but also the conduct occurring after it.
The mother has not rehabilitated herself. She has several times completed the first step in her drug rehabilitation only to return to abusing alcohol and drugs. She did not enroll in parenting classes. She has not maintained contact with her children or with DCF and has failed to appear for trial. She does not have adequate housing or income to raise children. While the state should and did assist the mother with these basic concerns, ultimately it is the obligation of the parent to provide for the needs and guidance of her child. See In re Juvenile Appeal(Docket No. 9489), 183 Conn. 11, 15 (1981). The mother has not fulfilled her obligations.
Further, in this case, the mother's limited mental capacities do not meet the special needs and developmental concerns that Alison and Daisy have. Indeed, the mother has only one year ago brought another premature, cocaine-addicted baby into this world, thus manifesting her lack of understanding of the needs of children and the responsibilities of parenthood. On this record, DCF has proven failure to rehabilitate for more than one year against the mother by clear and convincing evidence
The case against the father is also clear and convincing. The father did maintain fairly consistent visitation over the last year and did complete parenting classes. But his drug rehabilitation is incomplete, as the October, 1998 positive test for cocaine demonstrates. He has not maintained adequate housing or income. The father has acted irresponsibly in having seven CT Page 4925 children through three different mothers (to only one of whom he was married), and then, at least in the case of Alison and Daisy, contributing virtually nothing to the child's upbringing. The father apparently does not appreciate that being a father means more than conceiving a child.
His plan to place Alison and Daisy in the apartment with Leatha and the seven children confirms the father's simplistic approach to parenting. Alison and Daisy do not know their own father, much less Leatha and the seven children. Alison and Daisy have special developmental needs that the father's plan does not address. Physically, a three bedroom apartment with nine children and two adults is far from ideal. Although DCF is now seeking to remove Leatha's seven children, this solution to the overcrowding problem points out the more serious concern that Leatha has abused substances and neglected her children. To put Alison and Daisy into this environment would be to return them to the unhealthy conditions from which they were appropriately removed at birth. The failures short-sighted failure to understand these problems, combined with the other factors stated above, establishes clearly and convincingly that, for a period of more than one year, the father has failed to rehabilitate himself.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Alison and Daisy clearly and convincingly requires termination of the parental rights of their parents. These children have never lived with their parents. Their mother is a stranger to them; their father, at most a weekly visitor. Although the father has made some modest rehabilitative efforts, both parents lack the emotional and financial resources to raise children, especially ones with special needs like Alison's and Daisy's.
Alison and Daisy and the foster parents have bonded with each other. To Daisy, the foster parents are the only parents she has ever known. The foster parents have sacrificed greatly to help Alison and Daisy overcome their deficits and the foster parents CT Page 4926 are largely responsible for the progress that Alison and Daisy have made. With the presence of five other children whom they love, Alison and Daisy are in a happy home.
It is true that, because Alison and Daisy are black, placing them in a white foster home was not the ideal decision. But the foster parents, to their credit, have accepted Alison and Daisy with open arms. The court is persuaded that they will take an enlightened approach to the race issue. When Alison and Daisy grow older and become more curious about their heritage, the foster parents should permit visitation by responsible members of the girls' biological family. This court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaud v. Wawruck, 209 Conn. 407, 415 (1988).
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Alison and Daisy and offered the natural parents regular and lengthy visitation with transportation assistance. DCF also made referrals to substance abuse treatment centers and parenting clinics. These services were relevant to the parents needs and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order. CT Page 4927
On July 29, 1998, the court entered the following revised expectations for the parents to meet: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the children as often as DCF permits, (4) participate in parenting, individual, birth control, and drug and alcohol counseling (including inpatient substance abuse treatment if necessary), 5) secure and maintain adequate housing and income, 6) no substance abuse, and 7) no involvement with the criminal justice system. As detailed above, DCF substantially met its obligation to provide assistance. The father partially complied with the expectations. The mother's compliance was poor at best.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Alison and Daisy are bonded to their foster family. They do not have emotional ties to their natural parents.
5) The age of the child.
Alison will be four years old in August, 1999. Daisy was two years old on February 15, 1997.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that parents did not adjust their circumstances to make it in Alison's and Daisy's best interest to return to their home. The mother has abandoned these two girls and both parents have failed to rehabilitate themselves to the point where they could be responsible parents for them. CT Page 4928
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the parent's difficulties stem primarily from their own decisions and not from any unreasonable interference from each other or third parties, or from economic factors beyond their control.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Alison S. and Daisy S. for a termination of parental rights to enter with respect to the mother, Sylvia S. and the father, Arthur S. Accordingly, the court hereby grants the termination petitions. The court further orders that the Commissioner of DCF is appointed statutory parent for Alison and Daisy for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman, Judge, Superior Court
[2] Thus Daisy arrived in the foster home before her actual due date.
[3] For reasons that are unclear, the court entered a second adjudication of neglect concerning Daisy on July 29, 1998.
[4] The father and mother are also the parents of Stephanie S., who was born prematurely on February 9, 1998. The mother used alcohol and drugs during her pregnancy and Stephanie tested positive for cocaine when she was born. Stephanie is apparently in foster care and is not the subject of the petitions in question. The father's plan includes putting Stephanie in Leatha's home. The father also has two other children through a third maternity. In total, the mother has five children through CT Page 4929 two paternities, the father has seven children through three maternities, and Leatha has six children through three paternities.